United States District Court
Southern District of Texas
**ENTERED**
December 04, 2020
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| BRENDAN GAYTAN, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 2:19-CV-00316 |
| | § | |
| BRYAN COLLIER, *et al*, | § | |
| | § | |
| Respondents. | § | |

## MEMORANDUM AND RECOMMENDATION

Petitioner Brendon Gaytan is an inmate in the Texas Department of Criminal Justice and is currently incarcerated at the McConnell Unit in Beeville, Texas. Gaytan filed a counseled habeas corpus petition pursuant to 28 U.S.C. § 2254 on October 21, 2019. (D.E. 1, 3). Gaytan challenges his conviction and life sentence for capital murder, raising claims of actual innocence, ineffective assistance of counsel, and prosecutorial misconduct. Respondent filed a motion for summary judgment, to which Gaytan has responded. (D.E. 9, 13). As discussed more fully below, it is recommended that Respondent's motion for summary judgment be granted and Gaytan's habeas corpus petition be denied. It is further recommended that a Certificate of Appealability ("COA") be denied.

## I.    JURISDICTION

This court has jurisdiction pursuant to 28 U.S.C. § 1331 and venue is appropriate because Gaytan was convicted in Nueces County, Texas. 28 U.S.C. § 2254(a); 28 U.S.C. § 124(b)(6); *Wadsworth v. Johnson*, 235 F.3d 959, 961 (5th Cir. 2000).

## II.   BACKGROUND

### a.   Petition and Claims

In his § 2254 petition, Gaytan raises four claims regarding his actual innocence, the performance of both trial and appellate counsel, and prosecutorial misconduct.  (D.E. 1 at 6-11; D.E. 3 at 7-32).

First, Gaytan contends that he is actually innocent.  (D.E. 1 at 6; D.E. 3 at 7-21).  In support, Gaytan argues that his co-defendant Cruz Salazar was unavailable during trial due to his Fifth Amendment privilege, but the charges against Salazar were dropped after trial and he could provide an alibi for Gaytan.  (D.E. 1 at 6; D.E. 3 at 10-12).  Gaytan further contends that Arnold Valent, the one eyewitness to the crime, could not have seen what he testified to and gave several conflicting accounts of what he saw to police and, ultimately, at trial.  (D.E. 1 at 6; D.E. 3 at 13-22).  Lastly, Gaytan asserts that he could not fire the weapons allegedly used during the offense because he has malformed arms.  (D.E. 1 at 6).

Second, Gaytan contends that his trial counsel failed to adequately prepare for his cross-examination of the state's firearms expert, Carolyn Martinez.  (D.E. 1 at 8; D.E. 3 at 27-29).  Specifically, Gaytan argues that Martinez was able to give a flawed conclusion regarding the type of firearm used and discuss an unrelated box of bullets with Gaytan's fingerprints on it.  (*Id.*).  Gaytan asserts that counsel should have hired a ballistic expert to aid the defense and contends that the state court's denial of this claim was an unreasonable application of *Hinton v. Alabama*, 571 U.S. 263 (2014).  (D.E. 1 at 8; D.E. 3 at 29-30).

Third, Gaytan argues that appellate counsel was ineffective in several ways.  (D.E. 1 at 9; D.E. 3 at 25-27).  Gaytan contends that appellate counsel should have raised claims

that: (1) testimony from state witness Eloy Silva was more prejudicial than probative; (2) several witnesses violated a motion *in limine* regarding Gaytan's alleged gang membership; (3) the trial court should have granted a mistrial when the motion *in limine* was violated; and (4) the trial court should have given a jailhouse-informant instruction to the jury. (*Id.*). Gaytan argues that appellate counsel has admitted that he had no strategic reason to not raise a claim about the admissibility of Silva's testimony, and that the state court's denial of that claim was an unreasonable application of *Banks v. Dretke*, 540 U.S. 668 (2004). (D.E. 3 at 30-31).

Finally, Gaytan argues that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding information regarding Silva's history as a jailhouse informant. (D.E. 1 at 11; D.E. 3 at 25). Specifically, Gaytan contends that the state should have disclosed Silva's "informant source file." (D.E. 1 at 11; D.E. 3 at 24-25). Gaytan argues that the state court's denial of the *Brady* claim was an unreasonable application of *Banks* and *Kyles v. Whitley*, 514 U.S. 419 (1995). (D.E. 3 at 31-32).

### b.   State Court Records

#### i.   Trial

In February 2014, Gaytan and co-defendant Salazar were charged in an indictment with two counts of capital murder, in violation of Tex. Penal Code § 19.03, for knowingly and intentionally causing the death of two children under ten years old. (D.E. 8-5 at 10-11).

Prior to trial, Gaytan filed a motion *in limine* seeking to prevent any reference to his alleged gang membership or prior offenses.  (*Id.* at 179).  The trial court granted the motion.  (D.E. 8-34 at 11).

At trial, Katha McCalister, a police officer, testified to the following on cross-examination.  (*Id.* at 48).  When she arrived at the scene, Valent and the grandfather of one of the victims were saying: "They killed her.  They killed her."  (*Id.* at 57).  However, they could not provide any names.  (*Id.*).  Valent was "almost to a state of hysteria" and the grandfather, who was covered in blood, was "kind of in a shock."  (*Id.* at 58).  After both men calmed down somewhat, they still told officers that they did not know who committed the shooting.  (*Id.* at 59).

Ashley Leal, Valent's significant other and the mother of victim LillyAnna Valent, testified to the following.  (*Id.* at 74).  On the day of the shooting, they were celebrating their son's first birthday.  (*Id.* at 75).  Her brother, Jose Oliva, offered to have the party at his house.  (*Id.* at 76).  After dinner, the kids went outside to hit a piñata.  (*Id.* at 78).  While LillyAnna and Oliva's daughter played with their candy in the living room, Leal helped clean up.  (*Id.*).  They were about to sing happy birthday to her son when she heard what she initially thought were fireworks.  (*Id.* at 78-79).  She saw Valent sliding backwards and he told her to get down.  (*Id.* at 79).  As the gunfire came to an end, Valent went out the back of the house and jumped a side gate.  (*Id.*).  It was at this point that Leal saw that LillyAnna had been shot and took her outside.  (*Id.* at 80).  Soon after, she saw Oliva run out carrying his daughter Nevaeh, who had also been shot.  (*Id.* at 81).  Leal sat outside

holding her daughter, who had been shot in the head, until the ambulance arrived, but LillyAnna was pronounced dead at the hospital.  (*Id.* at 82-83).

Valent testified to the following.  (*Id.* at 119).  While the kids were sitting inside with their candy, he began to clean and get ready to leave.  (*Id.* at 128).  As he was carrying a stroller outside, he saw two men run up to the door.  (*Id.* at 128-29).  When they saw him, one of them fell over, but both had weapons and began shooting.  (*Id.* at 129).  Valent made eye contact with one of the men and recognized him as Gaytan.  (*Id.* at 129-30).  At this point in his testimony, Valent addressed Gaytan, saying: "I did eight months in boot camp with you, bro.  I know you.  You helped me get squared away in boot camp."  (*Id.* at 131-32).  Gaytan's counsel asked that the testimony be stricken, the jury by instructed to disregard the testimony, and that the court declare a mistrial.  (*Id.* at 132).  The court indicated that it would instruct the jury to disregard Valent's comment, but deny the motion for a mistrial.  (*Id.* at 133-34).  Counsel opted not to have the court give an instruction.  (*Id.* at 134).

Valent further testified that, although he immediately knew that Gaytan was the shooter, he did not tell the police because he was afraid for his life.  (*Id.* at 135-36).  He was hoping that someone else would come forward and implicate Gaytan.  (*Id.* at 137). The "law of the streets" was to take care of things on your own, outside of the court system, and that was Valent's intention.  (*Id.* at 138-39).  Prior to the shooting, Valent and three others broke into Gaytan's truck and stole a bag with $80 in change.  (*Id.* at 140-41).

Valent testified on cross-examination that the party was not at his house and that no one knew he was there.  (*Id.* at 141-42).  He did not admit that he knew Gaytan was the

shooter because people would try to kill him if he snitched.  (*Id.* at 145).  After the shots began, Valent backed up through the house, then went out the back door, jumped over a side gate, and saw the car the shooter was driving.  (*Id.* at 149).  It was a silver Malibu. (*Id.* at 150-51).  The shooters were carrying military-style rifles when Valent first saw them.  (*Id.* at 152).  He only saw rifles.  (*Id.* at 157).  He did not know the other men were going to break into Gaytan's truck and he only took $20 of the money.  (*Id.* at 164-65). The others broke the rear window of the truck to get in.  (*Id.* at 169).  Since talking to the police, Valent had gotten threats from gang members.  (*Id.* at 170-71).

Eric Enim, who lived near the scene of the shooting, testified that he had security cameras that faced the street and gave copies to the police for the night of the shooting. (*Id.* at 173-75).

Ashely Ornelas, a neighbor of Oliva's, testified that, after hearing several bangs, she looked out the window and saw a car in neutral with two or three guys running towards it and speeding away.  (D.E. 8-35 at 15).  It was a dark vehicle.  (*Id.* at 16).  She thought two people got in.  (*Id.*).

Martinez, a firearm examiner for the Corpus Christi Police Department, testified to the following.  (*Id.* at 35).  Officers recovered .45 caliber bullets, .45 caliber casings, and 7.62 caliber bullets from the scene.  (*Id.* at 41-42).  The .45 caliber bullets were compatible with pistols, while the 7.62 caliber bullets were compatible with rifles, including the AK-47 and SKS.  (*Id.* at 42).  She was never provided with any weapons on which she could do firearms testing because the firearms used in the shooting were never located.  (*Id.* at 42-43).  On recross-examination, Gaytan's counsel asked whether Martinez also examined

a box of ammunition found at Oliva's house.  (*Id.* at 45).  Martinez responded that she looked at them, but they were not fired.  (*Id.*).

Oliva testified to the following.  (*Id.* at 55).  After the piñata, his daughter Nevaeh was getting ready for bed, and Oliva and his wife were in their room.  (*Id.* at 60).  He could see Valent taking things out to his truck when he started hearing what sounded like balloons popping.  (*Id.*).  He got up and started walking to the living room when he saw LillyAnna get hit.  (*Id.* at 61).  He went to Nevaeh's room and saw her already laying on the ground. (*Id.*).  They got in their car and began to drive to the hospital, but intercepted an ambulance on the way.  (*Id.* at 62-63).  They were told at the hospital that Nevaeh died.  (*Id.* at 63).

Oliva further testified that he had known Gaytan for 14 or 15 years because they were stepbrothers.  (*Id.* at 64).  Around two weeks before the shooting, Henry Garcia brought several firearms to Oliva's house and asked Oliva to hold onto them.  (*Id.* at 65-66).  Both Oliva and Garcia had criminal records and were not supposed to have firearms. (*Id.*at 67).  All that was left in Oliva's garage at the time of the shooting was a bag of ammunition and armored vests.  (*Id.* at 68).  Oliva sold the rest of the items to Gaytan. (*Id.*).  On cross-examination, Oliva testified that, ten years prior, he was convicted of theft of a firearm because he was storing stolen firearms for a friend.  (*Id.* at 72-73, 81).  He assumed that the firearms and other items he was storing for Garcia were also stolen.  (*Id.* at 72).  He sold Gaytan three AR rifles, a large bag of ammunition, and a few clips.  (*Id.* at 75).  Oliva did not know what caliber bullets the rifles used.  (*Id.*).  He did not see anything on the night of the shooting.  (*Id.* at 78).

7

Trinidad Rayos, a relation of Valent's and Gaytan's, testified to the following.  (*Id.* at 87-88).  Two or three days before the shooting, he and some other individuals broke into Gaytan's truck.  (*Id.* at 88).  They were looking for something, but it was not in the truck, so they took $50 in quarters instead.  (*Id.* at 89).  They broke the back window to enter the truck.  (*Id.* at 90).  The other two individuals who robbed the truck were Valent and Garcia, although a fourth person stayed in the car.  (*Id.* at 92).

Roberta Rodriguez, Oliva's neighbor, testified to the following.  (*Id.* at 99-100).  She heard what she thought were fireworks, so she opened her door to look outside and instead saw a person dressed in all black clothes start running away.  (*Id.* at 101).  She only saw one person.  (*Id.* at 102).  She did not see anything else.  (*Id.*).

A fingerprint examiner for the Corpus Christi Police Department testified that Gaytan's fingerprints were found on several of the items that Oliva was storing for Garcia.  (*Id.* at 111-12).  The state acknowledged that these prints were merely on the stolen ammunition.  (*Id.* at 112).

Iris Flores, an acquaintance of Gaytan, testified to the following.  (*Id.* at 133).  On the day of the shooting, she was at a house with Gaytan and two others.  (*Id.* at 134).  At some point, Gaytan asked her to get a car for him, so she obtained a blue Malibu from a friend.  (*Id.* at 134-35).  Later that night, Gaytan, Salazar, and another man left in the car.  (*Id.* at 135-36).  About an hour and a half later, Gaytan and Salazar returned to the house, but they did not have the car.  (*Id.* at 136).  Gaytan told two others to take Flores to go pick up the car, which was parked behind someone's house.  (*Id.* at 137).  Flores brought the car back, where Gaytan and Salazar cleaned both the car and the keys.  (*Id.* at 137-38).

8

Gaytan wiped the keys off with his shirt and then handed them to his cousin, still in the shirt so that he did not touch them again.  (*Id.* at 138-39).  When Gaytan first came back to the house, he was excited and said: "It's time to make some fucking money."  (*Id.* at 139).  However, Gaytan got a phone call and then told her that she had to leave.  (*Id.*).

On cross-examination, Flores testified that Gaytan had been asking her to find him a car for two days because his truck was wrecked.  (*Id.* at 140).  Gaytan also owned a Mercedes, but something was wrong with the stickers and he could not drive it.  (*Id.*).  Gaytan exchanged crack cocaine to borrow the car.  (*Id.* at 141).  Flores did not know what Gaytan did with the car.  (*Id.* at 143-44).

Federico Gonzalez, another acquaintance of Gaytan, testified to the following.  (*Id.* at 157).  He was also at the house with Gaytan, Flores, and the others on the day of the shooting.  (*Id.* at 158).  At some point, Flores went and picked up a blue car, which Gaytan, Salazar, and others left in.  (*Id.* at 158-59).  They were gone a couple of hours.  (*Id.* at 160).  When they returned, they were acting "freaked out" and like something was wrong.  (*Id.*).  Gaytan told everyone to leave the house.  (*Id.* at 161).  Gonzalez was high at the time.  (*Id.* at 166).

The state next presented testimony from Eloy Silva.  Before he began his testimony before the jury, the trial court warned him that he could not indicate that Gaytan was involved with gang activity.  (*Id.* at 191).  Counsel objected to any of Silva's testimony being allowed.  (*Id.* at 193).

Silva testified that, during an earlier period of incarceration, he helped start a gang called Tango for protection against organized prison gangs like the Texas Syndicate and

9

Mexican Mafia.  (*Id.* at 195).  It was not mandatory for members of Tango to remain involved with the gang once released, and Tango was not considered a security threat by the TDCJ.  (*Id.* at 196).  Silva continued to associate with members of Tango outside of prison, but was no longer involved in leadership.  (*Id.* at 197).  After the shooting, Silva received a call from a detective and two other Tango members, who told him that the gang was being blamed for killing two children.  (*Id.* at 199).  There was an ongoing dispute between Tango and another gang that was believed to have played a part in the shooting. (*Id.*).  Two days after the shooting, Silva met up with Gaytan to see what really happened because Valent, a member of Tango, was continually lying to them about what happened. (*Id.* at 200).  Gaytan told Silva that "it was a big misunderstanding" and that "[i]t got fucked up."  (*Id.*).

Silva further testified that, at various times in the past, he had provided information to the District Attorney's office and law enforcement.  (*Id.* at 201-02).  This included getting plea bargain arrangements as a result of providing information.  (*Id.* at 202).  At the time of the meeting with Gaytan, Silva did not have any charges pending against him, but he was charged three months later in a domestic violence case.  (*Id.*).  Silva pled the charge down to a misdemeanor.  (*Id.* at 203).  The victim requested that the case be pled to a misdemeanor.  (*Id.*).

On cross-examination, Silva testified that he had about 20 felony convictions.  (*Id.* at 204).  Had he not pled the domestic violence charge down to a misdemeanor, he was subject to a habitual felony offender designation and a mandatory sentence of 25 years to life.  (*Id.* at 204-05).  He received that deal in return for testifying against Gaytan.  (*Id.* at

205).  Silva had never met Gaytan before the shooting.  (*Id.* at 206).  In response to this fact, Gaytan's counsel asked the following question: "So you just out of the blue went to my client's home on 7th street—".  (*Id.* at 206).  Silva responded: "What happened is we contacted one of your client's another gang member – I mean – I mean, another person that he knew at the time…"  Counsel did not object.  (*Id.*).  Silva next testified that law enforcement's file on him, which identified him as a member of not only Tango but also the Texas Syndicate and Mexican Mafia, was incorrect.  (*Id.* at 208).  Counsel then began to ask another related question, at which point Silva stated: "Did your client, did he admit that he was –".  The trial court interrupted Silva before he finished and had the jury removed from the courtroom.  (*Id.*).

Gaytan argued that Silva had violated the motion *in limine* twice and contended that the jury should be instructed to disregard his testimony, the testimony should be stricken, Silva should be disallowed from testifying, and the court should declare a mistrial.  (*Id.* at 209).  The court denied the motion for a mistrial.  (*Id.* at 210).  The court further noted that counsel elicited these answers based on his questioning and again gave the counsel the choice of whether he wanted a jury instruction to disregard.  (*Id.*).  Counsel opted to have such an instruction, which the court then gave.  (*Id.* at 210-11).

Silva continued to testify, stating again that the records were wrong and that he was only a member of Tango.  (*Id.* at 211).  He would be in trouble if he was a member of any of the other gangs and also claimed membership in Tango or any other gang.  (*Id.*).  While he was in jail, a nurse providing medical treatment thought he told her that he was wounded in the Army, but she misheard him.  (*Id.* at 216).  His brother was in the Army.  (*Id.*).  He

11

took psychotropic medication.  (*Id.* at 220).  He met Gaytan at an apartment along with Silva's friends "Debo, Demon, [and] Auto Destruct," although Silva did not know their real names.  (*Id.* at 223).  When he met with Gaytan, he identified himself as the speaker for Tango and stated that he was trying to figure out what happened because Valent was lying about it.  (*Id.* at 224-25).  Valent was telling Silva that the Texas Syndicate or people from Mexico shot up the house.  (*Id.* at 225).  Silva expected Valent to tell the truth because he was a member of the Tango.  (*Id.* at 226).  Valent eventually told Silva the truth after they threatened him a few times and told him "something was about to go off on the streets."  (*Id.*).  Many people threatened Valent, but he identified Gaytan as the shooter without provocation.  (*Id.* at 229-30).

Eleno Gates, Gaytan's cousin, testified to the following.  (D.E. 8-36 at 89).  He was with Gaytan, Salazar, Flores, and the others on the day of the shooting.  (*Id.*).  Gaytan told Gates that he had just gotten robbed and that he wanted to "handle up," which Gates interpreted to mean get his stuff back.  (*Id.* at 90-91).  Gaytan then left for less than an hour and, upon returning, told Gates that it was taken care of.  (*Id.* at 91).  Gaytan was calm and normal when he returned.  (*Id.*).

David Perez, a police detective, testified to the following.  (*Id.* at 92).  During the investigation, the police were able to determine the color, make, and model of the car used, along with the route it took upon leaving the scene.  (*Id.* at 95-96).  Specifically, they believed that the car drove past Enim's surveillance cameras and reviewed the footage. (*Id.* at 97-98).  The video was played for the jury and showed a dark-colored car driving past.  (*Id.* at 99).  The car drove past 21 seconds after the first 911 call.  (*Id.* at 100).  Over

the defense's objection, the trial court allowed, for demonstrative purposes only, a reenactment video that showed the car Gaytan borrowed the night of the shooting driving past the same surveillance cameras at roughly the same time of day. (*Id.* at 108-14, 116). On cross-examination, Perez stated that no witness specifically identified a dark-colored Malibu as the car they saw leaving the scene. (*Id.* at 121). In a previous interview with the police, Valent stated that he saw a silver Mercedes leaving the scene, not a Malibu. (*Id.*). Another witness saw a dark car, but thought it was Honda. (*Id.* at 122).

Following Perez's testimony, the state rested its case. (*Id.* at 130). Gaytan called only one witness, Detective Albert Armendariz, who testified to the following. (D.E. 8-37 at 7). He worked for the gang unit and had contact with Silva several times over the years. (*Id.* at 8). Armendariz was not directly involved in the investigation of the shooting. (*Id.*). However, he contacted Silva shortly after the incident, and Silva contacted him once before he was incarcerated as well. (*Id.* at 11). Silva did not tell Armendariz that Gaytan confessed until after Silva was incarcerated. (*Id.* at 13). On cross-examination, Armendariz noted that, under the "street code," gang members were not supposed to cooperate with law enforcement. (*Id.* at 17). He had gotten information about gang members from Silva before that was accurate, but nothing about specific cases. (*Id.* at 18).

The jury found Gaytan guilty on both counts of capital murder. (D.E. 8-39 at 5). Following additional sentencing proceedings and based on the jury's answers to special issue questions, the trial court sentenced Gaytan to life in prison without the possibility of parole. (D.E. 8-40 at 142).

### ii.   Motion for New Trial

Gaytan subsequently moved for a new trial, arguing that his trial counsels were ineffective because they: (1) failed to present evidence that Silva previously declared that Gaytan was being framed; (2) failed to present videos of Valent's televised pleas to help identify the shooter;  (3) failed to obtain a forensic examination of Valent's pants after he claimed that bullets went through them but did not hit him; and (4) failed to call witnesses to rebut Valent's claim that Gaytan was retaliating against him because of the truck robbery.  (D.E. 8-5 at 747-48).

At a hearing on the motion, trial counsel Eric Perkins testified to the following. (D.E. 8-43 at 9).  Perkins was second-chair to Rick Rogers, but he took the lead on the guilt/innocence stage of the trial and Rogers handled the punishment phase.  (*Id.* at 10). Rogers also participated in preparation for the guilt phase because, due to the lack of a confession or eyewitnesses, it was a more complicated case than an average death penalty case.  (*Id.* at 11).  The first time Valent claimed to be an eyewitness to Gaytan firing the shots was at trial.  (*Id.* at 13).  Perkins believed that they cross-examined Valent thoroughly on the difference between his statements to the police and his testimony, but he had not reviewed the transcripts and did not know specifically what the questions were.  (*Id.* at 14-16).  The videos of Valent's interviews with police were played for the court during the new trial hearing.  (*Id.* at 19-21, 23-27).  Perkins testified that they chose not to play the videos before the jury because they raised those issues in cross-examination and Valent admitted to giving prior inconsistent statements.  (*Id.* at 22).

Rogers testified that, when Valent was finished testifying, he and Perkins believed that they had successfully impeached Valent's testimony and did not want all of the taped interviews introduced.  (D.E. 8-44 at 24-25).  Rogers believed that the taped interviews could add credibility to Valent's explanations as to why he had not told a consistent story. (*Id.* at 25).  He acknowledged that Valent told the police he saw a silver Mercedes, which was directly contrary to his testimony at trial that he was completely certain he saw a Malibu, but Rogers believed Valent's testimony was already discredited based on the "10,000 other lies that he told."  (*Id.* at 26-28).  As to Silva, Rogers did not think anyone believed his testimony and, based on discussions with the investigator, he expected that Silva would respond to any questions about his previous outburst by saying that the murders were an accident.  (*Id.* at 30).  Perkins focused on the civilian witnesses, while Rogers focused on the police and scientific evidence.  (*Id.* at 48).  Rogers believed that Gaytan got convicted solely because of Flores's testimony and the corroborating testimony related to Gaytan borrowing the car.  (*Id.* at 51-52).

The trial court denied the motion for a new trial.  (D.E. 8-7 at 15).

### iii.   Direct Appeal

On direct appeal to the Texas Thirteenth District Court of Appeals, Gaytan argued that: (1) his trial attorneys were ineffective for failing to adequately impeach Valent and Silva, failing to refute the state's revenge theory, and failing to object to the home surveillance video; and (2) the trial court erred in allowing the state to present the demonstration video to the jury.  (D.E. 8-3 at 1-14).  The court affirmed Gaytan's conviction, concluding that counsel had adequately impeached Valent and that counsels

made the strategic decision to not further impeach Valent based on their conclusion that he had already been discredited.  (*Id.* at 5-8).  As for Silva, the court noted that it was unclear what he had said at the earlier court setting, Gaytan's counsel did not believe it would help the defense, and counsel otherwise impeached Silva by referencing his favorable plea deal.  (*Id.* at 8-9).  As to the state's revenge theory, the court concluded that Gaytan's preferred alternate theory, that his nephew burglarized the truck, lacked evidentiary support.  (*Id.* at 9-10).  As for the home surveillance video, the court rejected Gaytan's argument that the video was inadmissible.  (*Id.* at 10-12).  Finally, as to the demonstration video, the court concluded that the trial court did not abuse its discretion in allowing the jury to see the video for demonstrative purposes.  (*Id.* at 12-14).  Gaytan then filed a petition for discretionary review ("PDR") with the Texas Court of Criminal Appeals ("TCCA") raising ineffective-assistance arguments.  (D.E. 8-49 at 10-28).  The TCCA refused the petition. *See Gaytan v. State*, No. 13-15-00129-CR, 2017 WL 1737973 (Tex. App.—Corpus Christi-Edinburg May 4, 2017) (noting in the header that discretionary review was refused).

### iv.  State Habeas Application

Following the refusal of his PDR, Gaytan filed an application for a writ of habeas corpus in state court under Article 11.07 of the Texas Code of Criminal Procedure.  (D.E. 8-54 at 4-24).  In his Article 11.07 application, Gaytan argued, among other claims, that: (1) he was actually innocent; (2) his due process rights were violated by the reenactment video; and (3) appellate counsel was ineffective for failing to raise a claim that Silva's testimony was inadmissible and that he violated the motion *in limine*.  (*Id.* at 9-21).  The

16

trial court concluded that Gaytan failed to show that appellate counsel was ineffective and that he failed to show entitlement to relief on the other grounds, and accordingly recommended that the 11.07 application be denied. (*Id.* at 60).

Gaytan filed a motion to remand for an evidentiary hearing, which the TCCA denied *per curiam*. (D.E. 8-51 at 1-13). However, the TCCA noted that it would not rule any sooner than 30 days from the date of denial, giving Gaytan the opportunity to submit additional evidence or an amended habeas application to the trial court.[1]

Gaytan then filed an amended Article 11.07 application, raising the same claims as in his present § 2254 petition, among others. (D.E. 8-52 at 4-47). Gaytan attached several exhibits to the amended application.

In an interview with the police on February 17, 2014, one day after the shooting, Detective Perez told Valent that everything indicated that the shooters were looking for him. (D.E. 8-52 at 108). Valent insisted that he had no idea who would be looking for him or why. (*See, e.g., id.* at 108-16, 118). The detectives continually indicated that Valent was not being honest. (*See, e.g., id.* at 112-15). The detectives showed Valent a picture of Gaytan, who he initially denied knowing, and then said he was previously locked up in bootcamp with. (*Id.* at 116-17). Valent insisted that he did not know who the shooters were or why anyone would want to shoot him. (*Id.* at 137). The detectives specifically asked if Gaytan had anything to do with it, and Valent responded that he had "no beef"

---

[1] A copy of this order does not appear to be in the record. However, it is available on the TCCA's website after searching for the case number, WR-89,063-01. *See* http://search.txcourts.gov. The order was issued on October 31, 2018, which is consistent with the written notation at the top of the motion in the record. (*See* D.E. 8-51 at 1).

with Gaytan.  (*Id.* at 138).  Valent asked why they were not questioning Gaytan if others were saying he did it, stating that someone would eventually admit it under questioning. (*Id.* at 141).

In an interview with the police on February 21, 2014, Valent stated that he was scared for the rest of his family and, contrary to what he said four days prior, he knew Gaytan was the shooter because he saw him fire the gun and speed away in a silver Mercedes.  (*Id.* at 52).  Valent stated that his brother-in-law broke into Gaytan's truck and Gaytan was retaliating for that.  (*Id.* at 53).  Valent only saw one person.  (*Id.* at 57).  He recognized Gaytan immediately upon opening the door, but did not see a gun.  (*Id.* at 59-60).  He had also seen Gaytan driving a Mercedes previously.  (*Id.* at 60).  Valent continued to deny that Gaytan had any reason to retaliate against him.  (*Id.* at 61).  He stated that he did not previously tell the detectives that it was Gaytan because he was scared for his family.  (*Id.* at 63-64).  He knew Gaytan owned guns because he bought them from Oliva. (*Id.* at 65).  Valent said he was 75 percent sure it was Gaytan.  (*Id.* at 69).  He did not notice if the shooter had short arms.  (*Id.* at 70).  The detectives told him he had to be 100 percent sure, and Valent responded he was 100 percent sure it was Gaytan because he had seen Gaytan driving that silver Mercedes.  (*Id.*).  The detectives told Valent they would try to make the case based on what he told them, but that he has still lying to them about other aspects of what happened.  (*Id.* at 82).

Perkins stated in an affidavit that he was not given *Brady* evidence related to Silva, specifically information regarding his use as a career informant and a prior arrest and conviction for impersonating a U.S. Marshall.  (*Id.* at 169-70).  He stated that the state's

failure to turn over this information prevented him from effectively cross-examining Silva. (*Id.* at 170). Perkins further stated that Salazar was a key alibi witness for Gaytan, but Salazar's lawyers prevented him from speaking with Perkins because he was also charged in the offense. (*Id.* at 170-71). Lastly, Perkins stated that Rogers did not conduct any meaningful trial preparation, but nonetheless insisted on cross-examining several witnesses despite knowing very little about the case. (*Id.* at 171-72). Perkins stated in a subsequent declaration that he had discussed Silva with a former Assistant District Attorney, who stated that he knew Silva was "a little off," but that he provided persuasive and consistent testimony. (*Id.* at 182-83). In a third declaration, Perkins stated that Rogers was lead counsel and was responsible for making key decisions in the case. (*Id.* at 186). Rogers decided that he would cross-examine the state's ballistics expert. Rogers and Perkins decided against obtaining a ballistics expert because they thought other areas of investigation would be more important, given that there was little evidence connecting Gaytan to the crime scene. (*Id.*). Had they obtained a firearms expert, they may have been able to show that Gaytan could not have fired a weapon at the trajectory the bullets entered the home and that there were two shooters. (*Id.* at 186-87). Hiring a ballistics expert may have helped impeach the state's ballistics expert, however, it was a strategic decision not to hire an expert. (*Id.* at 187). Perkins reiterated that Rogers did not conduct any pretrial preparation. (*Id.* at 188).

Texas G. Burrell, a licensed private investigator, stated the following in an affidavit. (*Id.* at 95). Burrell had extensive experience and training in firearms. (*Id.*). Burrell attempted to interview Valent in prison, but Valent insisted on having an attorney present,

which Burrell understood to mean that Valent lied at trial.  (*Id.* at 95-96).  He also reviewed Martinez's testimony and found several deficiencies, including her conclusion that an SKS or AK-47 had to be used because of the recovered 7.62 caliber rounds.  (*Id.* at 96).  Many types of firearms can shoot 7.62 caliber rounds.  Moreover, the wound on LillyAnna Valent's head appeared to be caused by a .45 caliber bullet, not a 7.62 caliber bullet. Nevaeh Oliva's wound appeared to be caused by a rifle round.  If Gaytan had fired in excess of 50 rounds with an AK-47, his hands would have been burned, but there was no evidence that he was wearing gloves or that he was burned.  Lastly, based on Gaytan's height and the elevation of the house, someone of his height "would not be able to fire the shots into the house at the trajectory indicated in the [crime scene] photos."  (*Id.*).  Burrell did not specifically identify what crime scene photos he reviewed, but there were two distance photos of the home also attached to the Article 11.07 application.  (*Id.* at 98, 100).

Micah Hoevelman stated the following in a declaration.  (*Id.* at 177).  Martinez incorrectly referred to the SKS and AR-15 as bolt guns.  She incorrectly referred to 7.62 caliber bullets without recognizing that there are several types of 7.62 caliber bullets, and also incorrectly said that the SKS and AK-47 were the only two weapons that shoot 7.62 rounds.  Lastly, "brass catchers," a device used to catch used casings, were not widely available for this type of weapon at the time of the crime.  Hoevelman did not state what his qualifications were.  (*Id.*).

Mark Stevens, a defense attorney, stated in a declaration that any competent attorney would hire a ballistics expert in any case where ballistics or weapons are involved.  (*Id.* at 180).

20

Joseph Ron Barroso, Gaytan's appellate attorney, stated the following in an affidavit.  (*Id.* at 174).  Although he reviewed the entire record and was aware of trial counsel's objection to Silva's testimony on the ground that it was uncorroborated jailhouse informant testimony, he did not raise the issue on appeal.  (*Id.* at 174-75).  This was not strategic in any way and he believed that it denied Gaytan the effective assistance of appellate counsel.  (*Id.* at 175).

After Gaytan's conviction, the state dismissed the charges against Salazar due to insufficient evidence.  (*Id.* at 87).  After being released, Salazar stated in an affidavit that he and Gaytan did not borrow a blue Malibu from anyone and that they were at Salazar's apartment at the time of the shooting.  (*Id.* at 89).  Neither he nor Gaytan owned any firearms.  (*Id.*).

Gaytan also attached photos of his abnormally short arms, the blue Malibu he allegedly borrowed, and the silver Mercedes he owned.  (*Id.* at 91-93, 104-05).

The state responded that Gaytan's actual-innocence claims were instead attacks on the sufficiency of the evidence.  (D.E. 8-53 at 12).  As to the ineffective-assistance claims, the state argued that Gaytan failed to establish that counsel's conduct fell below an objective standard of reasonableness or that the result of the trial or appeal would have been different but for any deficiency.  (*Id.* at 14-15).  As to the *Brady* claim, the state argued that the allegations were based on hearsay and should not be considered.  (*Id.* at 16).  Moreover, the state argued that there was no *Brady* violation because there was no informant-source file.  (*Id.* at 18).

Douglas Mann, the lead prosecutor in the case, stated the following in an affidavit. (*Id.* at 37).  He became familiar with Silva through another attorney at the District Attorney's Office.  He was aware that Silva had dealings with both this attorney and Mann's predecessor, both of whom Mann consulted about Silva's value as a witness.  No one informed Mann prior to trial of any past incident where Silva provided false testimony or information.  At the time of trial, there was no requirement that the state maintain an informant file and such a file did not exist.  Prior to trial, Mann met with Perkins and shared Silva's prior convictions and some stories about Silva's history with the other attorneys. Mann's only concern about using Silva as a witness was his extensive criminal history, not any knowledge or concern about a history of providing false information.  (*Id.*).

The state trial court concluded that: (1) the assertions in the state's response were correct; (2) both trial and appellate counsels provided effective assistance of counsel; and (3) Gaytan failed to show his entitlement to relief on any of the other grounds.  (*Id.* at 39). Accordingly, the trial court recommended that the amended Article 11.07 application be denied.  (*Id.*).  A judge of the TCCA subsequently denied the Rule 11.07 application without a written order.  (D.E. 8-50 at 1).

## III.  DISCUSSION

### a.   Standard of Review

#### i.   *Deference Afforded to State Court*

A § 2254 petition raising claims that were adjudicated on the merits in state court may not be granted unless the adjudication of the claim: (a) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as

22

determined by the Supreme Court; or (b) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state court. 28 U.S.C. § 2254(d).

Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the U.S. Supreme Court on a question of law or if the state court decides a case differently than the Court on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.  *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Although "unreasonable" is difficult to define, the Supreme Court noted that it is an objective, rather than subjective, standard and emphasized that there is a critical difference between an unreasonable application of federal law and a merely "incorrect" or "erroneous" application of federal law.  *Neal v. Puckett*, 239 F.3d 683, 687 (5th Cir. 2001).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks omitted).  This is a difficult standard to meet.  *Id.* at 102-03.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id.* at 99. Where a state court decides a prisoner's federal claim on the merits in a reasoned opinion,

the federal court merely "reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Even summary rulings by state courts are afforded deference under § 2254(d), and in such cases, the relevant question is what arguments or theories could have supported the state court's decision. *Harrington*, 562 U.S. at 99, 102.

If a decision by a state court is silent as to the reasons for the refusal, a federal habeas court can "look through" the decision and evaluate the last reasoned state court decision. *Bledsue v. Johnson*, 188 F.3d 250, 256 (5th Cir. 1999). A state court's factual findings are presumed to be correct and a petitioner has the burden of rebutting the presumption with clear and convincing evidence. *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006). This deference extends not only to express findings of fact, but to the implicit findings of the state court. *Id.* In addition, "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 562 U.S. at 98.

Here, as an initial matter, Gaytan contends that the state trial court did not consider or make a recommendation on the claims in his amended Article 11.07 application, but this is factually incorrect. (*See* D.E. 3 at 2, 6-7; D.E. 13 at 5). Gaytan filed the amended Article 11.07 application in November 2018. (D.E. 8-52 at 20). The trial court then issued its findings of fact, conclusions of law, and recommendation on the amended application in January 2019. (D.E. 8-53 at 39). Lastly, the TCCA denied the amended Article 11.07 application in September 2019. (D.E. 8-50 at 1).

Gaytan also attached an April 2019 order from the TCCA ordering the trial court to forward the amended petition and attachments.  (D.E. 1-2 at 1).  However, this order does not indicate that the trial court did not make a recommendation on the amended petition, but rather that it failed to forward a copy of the amended petition to the TCCA with the recommendation.  This is consistent with the record, which indicates that the TCCA received the trial court's recommendation on the amended application on February 5, 2019, but received a copy of the application itself and related materials on May 30, 2019.  (D.E. 8-52 at 1; D.E. 8-53 at 1).  Thus, Gaytan has not established that the typical standard of deference is inapplicable here.

### ii.    Ineffective-Assistance Standard

To prevail on an ineffective assistance of counsel claim, a petitioner must meet the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  He must show that counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial whose result is reliable.  *Id.* at 687-88.

Judicial scrutiny of counsel's performance must be highly deferential and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 689.  A court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.

25

The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id.* at 690.

To show prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 695.

Federal court review of a state court's denial of an ineffective-assistance claim is "doubly deferential" because the court must give deference both to counsel's performance and to the state court's conclusion. *Cullen*, 563 U.S. at 190. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 105.

### b.   Actual Innocence

In the motion for summary judgment, Respondent argues that a freestanding claim of actual innocence is not cognizable in a § 2254 petition. (D.E. 9 at 9).

Gaytan responds that actual innocence claims are cognizable in federal court where the petitioner raises other constitutional claims as well. (D.E. 13 at 6).

A federal habeas petitioner is not entitled to relief based on a freestanding claim that newly discovered evidence shows that he is actually innocent. *Herrera v. Collins*, 506 U.S.

390, 404-05 (1993).  A claim of actual innocence in a federal habeas case is instead cognizable only to "seek excusal of a procedural error so that [the petitioner] may bring an independent constitutional claim." *Id.* at 404.  In other words, there is a distinction between "habeas petitioners who assert that their actual innocence in itself presents a violation of their constitutional rights," whose claim is not cognizable, and "petitioners who assert that their actual innocence acts as a catalyst to bring them within that narrow class of cases in which the refusal of the court to hear their underlying constitutional claims will result in a fundamental miscarriage of justice," whose claim is cognizable for a limited purpose. *Lucas v. Johnson*, 132 F.3d 1069, 1076 (5th Cir. 1998) (internal quotation marks omitted). For petitioners in the latter group, they must show that, in light of new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).  If the petitioner makes this showing, then the court may proceed to consider the merits of the otherwise barred underlying constitutional claims.  *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000).

Here, Gaytan's freestanding claim of actual innocence is not cognizable in a § 2254 petition.  Gaytan's interpretation of when an actual-innocence claim can be considered is backwards.  He contends that raising other constitutional claims is a gateway through which he can raise a freestanding actual-innocence claim.  (D.E. 13 at 6).  Instead, an actual-innocence claim in a § 2254 petition serves only as a gateway through which a federal court may consider constitutional claims that would otherwise be procedurally barred.  *Herrera*, 506 U.S. at 404-05.  In short, even if a petitioner presents new evidence showing that no reasonable juror would have found him guilty beyond a reasonable doubt,

27

that serves only as a prerequisite to the court's consideration of otherwise barred constitutional claims, not as a source of habeas relief itself. *See Dowthitt*, 230 F.3d at 741. Respondent makes no argument that any of Gaytan's underlying constitutional claims are procedurally barred, nor does his actual-innocence claim "supplement" any of his constitutional claims, and Gaytan's freestanding claim of actual innocence is therefore not cognizable. *See Herrera*, 506 U.S. at 404; *Lucas*, 132 F.3d at 1076.

### c.   Ineffective Assistance of Trial Counsel

Respondent first argues that, as to the claim that counsel failed to hire a defense expert, neither Burrell nor Hoevelman identify themselves as a ballistics expert in their affidavits and Gaytan has not established that a ballistics expert was prepared to give testimony that would have changed the outcome of the trial. (D.E. 9 at 11). Second, Respondent contends that Martinez's testimony was brief, did not involve much substantive evidence, and was successfully devalued on cross-examination. (*Id.*). Respondent asserts that, contrary to Burrell's affidavit, Martinez never testified regarding what type of bullet killed the victims or that a 7.62 mm round could only be used in certain types of firearms. (*Id.* at 11-12). Lastly, Respondent argues that, even if Martinez could have been impeached on these issues, it would not have changed the outcome of the trial. (*Id.* at 12).

Gaytan responds that, had counsel conducted a thorough investigation, he would have realized that a ballistic expert was necessary to rebut Martinez's testimony. (D.E. 13 at 7). He argues that the failure to hire a defense expert was not a strategic decision and prejudiced him because the jury was required to believe the state's expert and counsel

ineffectively cross-examined the state's expert.  (*Id.* at 7-8).  He argues that Martinez's testimony was important because it supported Valent's testimony that he saw military-style weapons.  (*Id.* at 8-9).  Further, Gaytan argues that Burrell was a firearms expert and would have been available to testify at trial, including offering testimony that one of the victims was killed by a .45 caliber bullet, which rebutted Valent's testimony regarding military-style weapons.  (*Id.* at 9-10).

Counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 690-91.  Strategic decisions made after thorough investigation are "virtually unchallengeable," and strategic decisions made after less investigation "are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id.*

Complaints of uncalled witnesses are disfavored because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.  *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981).  This rule applies equally to uncalled expert witnesses.  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  To prevail on such a claim, a petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense.  *Id.*

Here, Gaytan has not established that the state court's conclusion that counsel's performance was not deficient, and that he was not prejudiced by any deficiency, was contrary to, or an unreasonable application of, clearly established federal law.  First, Gaytan

has not established that counsel was deficient.  Although Perkins stated that hiring a ballistics expert may have helped the cross-examination of Martinez, he maintained that not hiring an expert was a strategic decision to expend resources elsewhere because there was little evidence connecting Gaytan to the crime scene.  (D.E. 8-52 at 186-87).  Perkins did state that Rogers did not conduct a sufficient pretrial investigation, but he also stated that the decision not to hire a ballistics expert was shared by him, was not solely Rogers's decision, and was strategic.  (*Id.* at 171-72, 188).   Given that there was no evidence connecting Gaytan to any firearms related to the offense, Gaytan has not established that the decision to expend resources elsewhere was outside the wide range of professionally competent assistance, much less established that the state court acted unreasonably in denying this claim.  *Strickland*, 466 U.S. at 690-91.

Gaytan cites *Hinton* as the case the state court unreasonably applied.  (D.E. 3 at 29-30).  The Supreme Court ruled in that case that counsel was deficient where he did not replace an expert that he knew was inadequate because he falsely believed that he could not obtain more funding under state law.  *Hinton*, 571 U.S. at 274-75.  These facts are not analogous to this case, where Gaytan's trial counsels concluded that an expert was not necessary based on the state's evidence and their strategic needs, not due to their ignorance of a point of law.  As discussed above, Gaytan has not established under the facts of his case that the decision not to hire an expert was outside the wide range of professionally competent assistance.  Gaytan's citation to *United States v. Haines*, 803 F.3d 713 (5th Cir. 2015), is similarly misplaced.  The decision in *Haines* concerned a case agent that gave testimony regarding both his expert opinion about the meaning of coded phrases and his

lay opinion about the defendant's actions in the case. *Haines*, 803 F.3d at 729-30. The Fifth Circuit concluded that such testimony was particularly problematic because the case agent was given an "aura of special reliability and trustworthiness" based on his status as an expert, among other issues, which potentially bolstered the credibility of his lay testimony. *Id.* at 730 (citation omitted). Martinez did not give any testimony based on personal knowledge of Gaytan or the offense, but rather spoke only of the types of bullet casings found at the scene and related expert testimony. (D.E. 8-35 at 35-48).

Further, even if Gaytan has established that trial counsels were deficient, he has not established that he was prejudiced by the failure to hire a ballistics expert because he has not shown that the testimony would have been favorable to a particular defense. *Day*, 566 F.3d at 538. First, it is unclear how Burrell's opinion regarding what caliber bullet killed each child would have altered the result of the proceedings. (D.E. 8-52 at 96); *Strickland*, 466 U.S. at 695. This in no way rebuts Martinez's testimony, as she discussed the fact that both .45 and 7.62 caliber rounds were found at the scene. (D.E. 8-35 at 41-42). Martinez gave no testimony regarding which type of round killed each child. To the extent Gaytan argues that Burrell's testimony on this issue would have undermined Valent's credibility because he testified that he only saw military-rifles, again, it was undisputed that at least one firearm used was not a military-style rifle. (*Id.* at 42).

Second, as to Burrell's opinion that Gaytan would not have been able to fire shots into the house at the trajectory indicated in the photos, it is unclear what photos Burrell drew this conclusion from or how he could draw this conclusion based solely on photos. (*See* D.E. 8-52 at 95-96). Burrell stated only that he reviewed "the crime scene photos

from the Corpus Christi Police Department," but did not describe or attach the specific photos he relied on,[2] explain what he saw in the photos that led him to this conclusion, or outline how his stated qualifications applied to the examination of crime scene photos. (*See id.*).

Moreover, Burrell did not state in the affidavit that he was available to testify at trial and would have done so. (*See* D.E. 8-52 at 95-96). This alone makes his affidavit insufficient under the Fifth Circuit's standard in *Day*. *See Day*, 566 F.3d at 538-39.

Third, Hoevelman's declaration did not state any of his qualifications. As background, he provided his birthdate, but being born on September 6, 1977, is not, in and of itself, a qualification to opine on how "professional circles" would quibble with Martinez's testimony. (D.E. 8-52 at 177). Even taking Hoevelman's statements at face value, Martinez did not testify regarding any evidence connecting Gaytan to the firearms used in the offense and, as such, it is unclear how Gaytan was prejudiced by the failure to rebut Martinez's alleged misapplication of the term "bolt gun," failure to acknowledge that there are multiple types of 7.62 caliber rounds, or failure to acknowledge that brass catchers were not "widely available" at the time of the offense. (*Id.*). Gaytan's primary argument on this issue is that Martinez's testimony bolstered Valent's testimony that he only saw military-style rifles, but Martinez's testimony already contradicted Valent because she discussed the .45 caliber pistol rounds also found at the scene. Further, Gaytan's briefing,

---

[2] There were two photos of the house attached to Gaytan's amended Article 11.07 application. (D.E. 8-52 at 98, 100). However, if these were the photos Burrell relied on, it is unclear how he ascertained the trajectory of the bullets from these two distant photos of only the front of the house.

Burrell's affidavit, and Hoevelman's declaration all misstate the contents of Martinez's testimony regarding 7.62 caliber bullets and their compatibility with the SKS and AK-47. (D.E. 1 at 8; D.E. 8-52 at 96, 177).  Martinez was initially asked questions about the SKS and AK-47 and subsequently testified that 7.62 caliber rounds were consistent with those two firearms, not that those were the only two types of firearm that use 7.62 caliber rounds. (D.E. 8-35 at 40-42).  Neither expert has refuted Martinez's actual testimony on that issue.

Lastly, as to Gaytan's claim that counsel's lack of preparation allowed testimony about unrelated ammunition to go unchallenged, Martinez testified that she did not examine the box of bullets in Oliva's garage, and the fingerprint examiner testified that the box was not connected to the rounds used in the shooting.  (D.E. 8-35 at 45, 112).  The testimony regarding this unrelated ammunition was not unchallenged.

Under these circumstances and based on the affidavits and declarations submitted in support of the Article 11.07 application, Gaytan has not established that the state court's conclusion that counsel's performance was not deficient, and that he was not prejudiced by any deficiency, was contrary to, or an unreasonable application of, clearly established federal law.

### d.    Ineffective Assistance of Appellate Counsel

Respondent first argues that, as to the lack of a jury instruction regarding Silva's alleged jailhouse informant status, there was no objection made at trial regarding the lack of an instruction.  (D.E. 9 at 15).  Second, as to the motion *in limine* and references to Gaytan's alleged gang membership, Respondent argues that Silva never violated the court's order and, even if he did, the court's instruction to disregard cured any harm.  (*Id.*

at 15-16).  Finally, as to the admissibility of Silva's testimony, Respondent contends that the trial court heard Silva's proposed testimony outside the presence of the jury and that the credibility determination was within the trial judge's discretion.  (*Id.* at 17).

Gaytan first responds that, as to the lack of an instruction regarding Silva's alleged jailhouse informant status, trial counsel objected to the inclusion of Silva's testimony in its entirety and, regardless, the instruction was required *sua sponte* based on the evidence presented.  (D.E. 13 at 11-13).  Moreover, Gaytan argues that the fact that Silva was not in jail at the time he spoke with Gaytan is irrelevant because Silva was in jail when he testified.  (*Id.* at 12).  Gaytan does not raise any additional argument on the other grounds regarding appellate counsel's performance.

Claims that appellate counsel rendered ineffective assistance are evaluated under the *Strickland* standard.  *Smith v. Robbins*, 528 U.S. 259, 285 (2000).  In the context of an appeal, this means that the defendant must show that, but for counsel's errors, he would have prevailed on appeal.  *Id.* at 286.  This standard applies when a petitioner argues that appellate counsel failed to raise one or more specific issues, which is the type of claim Gaytan has raised.  *Lombard v. Lynaugh*, 868 F.2d 1475, 1480 (5th Cir. 1989).[3]

---

[3] Gaytan argues that appellate counsel failed to subject the state's trial to meaningful adversarial testing and that prejudice is presumed.  (D.E. 13 at 11).  This is plainly not the case.  As noted in *Lombard*, the presumption of prejudice applies only where there has been an "actual or constructive complete denial of any assistance of appellate counsel," such as where appellate counsel does not file a brief at all.  *Lombard*, 868 F.2d at 1480. Gaytan's appellate counsel filed a detailed appellate brief of over 50 pages, raising multiple points of error, along with a supplemental brief of over 20 pages addressing a newly-decided state court course relevant to the appeal.  (D.E. 8-8 at 1-56; D.E. 8-10 at 1-26).

Under Texas law, trial courts are required to instruct the jury *sua sponte* on the applicable law, regardless of whether any party requests a particular jury instruction. *Phillips v. State*, 63 S.W.3d 59, 65 (Tex. Crim. App. 2015). The Texas Code of Criminal Procedure states that: "A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant," unless there is other corroborating evidence that tends to connect the defendant to the offense. Tex. Code Crim. P. art. 38.075(a).

Under Texas law, testimony that is violative of a motion *in limine* "is rendered harmless by an instruction to disregard by the trial judge, unless it appears the evidence was so clearly calculated to inflame the minds of the jury or is of such damning character as to suggest it would be impossible to remove the harmful impression from the jury's mind." *Kemp v. State*, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992). Where a curative instruction suffices, the trial court does not abuse its discretion in denying a mistrial request. *Lee v. State*, 549 S.W.3d 138, 145 (Tex. Crim. App. 2018).

Evidence may be excluded if its probative value is substantially outweighed by its prejudicial effect. Tex. R. Evid. 403. The trial court has "considerable latitude to assess the courtroom dynamics, to judge the tone and tenor of the witness' testimony and its impact upon the jury, and to conduct the necessary balancing." *Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007). Rule 403 is slanted toward the inclusion of all relevant evidence. *Id.*

35

Here, Gaytan has not established that the state court's conclusion that appellate counsel's performance was not deficient, and that he was not prejudiced by any deficiency, was contrary to, or an unreasonable application of, clearly established federal law.  First, as to the lack of a jailhouse-informant jury instruction, appellate counsel stated in his affidavit that his failure to raise this claim was not strategic in any way.  (DE. 8-52 at 174-75).  However, a jailhouse-informant instruction was inapplicable to Silva's testimony, and counsel's failure to raise this claim was neither deficient nor prejudicial.  As the plain language of Article 38.075(a) indicates, it applies only when the defendant makes a statement against his interest to another inmate "during a time when [they were] imprisoned or confined in the same correctional facility."  Tex. Code Crim. P. art. 38.075(a).  It is undisputed that, at the time Silva spoke to Gaytan, neither were imprisoned or confined in any correctional facility.  (D.E. 8-35 at 199-200).

Gaytan contends that this fact is irrelevant because Silva did not actually provide the information to authorities until he was imprisoned, and the purpose of Article 38.075, as stated by the TCCA, was to require corroboration because "[j]ailhouse-witness testimony is inherently unreliable due to the inmate's incentive to better his circumstances."  *Phillips*, 463 S.W.3d at 66.  Nevertheless, whatever the purpose of Article 38.075, both Texas and federal courts have concluded that its plain language makes it inapplicable if the informant and the defendant were not confined in the same correctional facility at the time of the defendant's statement.  *See Hardesty v. State*, No. 03-18-00546-CR, 2019 WL 4068564, at *3 (Tex. App. Aug. 29, 2019), petition for discretionary review

refused (Dec. 11, 2019); *Evens v. Dir.*, No. 3:17-CV-2032-C-BN, 2020 WL 5993642 (N.D. Tex. Oct. 9, 2020).

Second, as to the violations of the motion *in limine* and the trial court's denial of Gaytan's motion for a mistrial, the trial court gave the jury an instruction to disregard. (D.E. 8-35 at 210-11). Silva's first reference to Gaytan's gang membership was in response to Perkins's question about why Silva met with Gaytan at all, and Silva immediately attempted to correct the mistake. (*Id.* at 206). There was no objection. Then, while Perkins was questioning Silva about his own gang history, Silva interjected: "Did your client, did he admit that he was…" (*Id.* at 208). The trial judge interrupted him before he got any further and removed the jury. (*Id.*). It was at this point that the trial court denied the motion for a mistrial and, upon the jury's return, gave the instruction to disregard. (*Id.* at 209-11). Outside of the provocative questions on cross-examination, Silva refrained from referencing Gaytan's alleged gang membership. The testimony was not clearly calculated to inflame the minds of the jury, and the brief and passing references elicited on cross-examination were not so damning that an instruction to disregard was insufficient. *Kemp*, 846 S.W.2d at 308. Accordingly, Gaytan has not established that appellate counsel was deficient for failing to raise this claim or that he was prejudiced.

Finally, as to whether Silva's testimony was more prejudicial than probative, Gaytan has not established that the trial court abused its wide discretion in allowing Silva to testify. Rule 403 favors the inclusion of all relevant evidence, and the trial court has considerable latitude in assessing a witness's credibility and the effect of his testimony. *Winegarner*, 235 S.W.3d at 791. While the contents of Silva's testimony were undoubtedly damaging

to Gaytan, he has not argued how its probative value was substantially outweighed by any prejudicial effect.  Gaytan's petition raises this claim in only one sentence.  (D.E. 1 at 9). Moreover, trial counsel's cross-examination effectively discredited Silva, bringing out details of his extensive criminal history and the generous plea deal he received to testify. (D.E. 8-35 at 204-05).  Thus, Gaytan has not established that appellate counsel was deficient for failing to raise this claim or that he was prejudiced.

Accordingly, Gaytan has not established that the state court's conclusion that appellate counsel's performance was not deficient, and that he was not prejudiced by any deficiency, was contrary to, or an unreasonable application of, clearly established federal law.

### e.    Prosecutorial Misconduct

Finally, Respondent argues that there was no *Brady* violation because Silva's ties to the district attorney's office and law enforcement came out and were discussed during cross-examination, which indicated that counsel did know about Silva's history of providing information.  (D.E. 9 at 18-19).  Moreover, Respondent argues that Gaytan successfully impeached Silva's testimony by discussing his history as an informant and the benefits he gained from it.  (*Id.* at 19).

Gaytan responds that the issue is Silva's ongoing relationship with the district attorney and his continual use as a jailhouse informant.  (D.E. 13 at 14).  He argues that counsel did not learn of Silva's relationship with the district attorney until after the conclusion of the trial and that Respondent incorrectly cites parts of the record to argue otherwise.  (*Id.* at 14-15).  Finally, Gaytan argues that counsel never received any *Brady*

evidence about Silva, despite specifically requesting it, and had counsel known of Silva's history, he would have been able to more effectively cross-examine him.  (*Id.* at 15-16).

The prosecution must provide evidence favorable to the accused upon request. *Brady*, 373 U.S. at 87.  The failure to do so is a violation of due process if the evidence is material to guilt or punishment.  *Id.*  This includes evidence that affects the credibility of a witness.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).  To succeed on a *Brady* claim, a defendant must show that the evidentiary suppression undermines confidence in the outcome of the trial.  *Kyles*, 514 U.S. at 434.

Here, Gaytan has not established that the state court's denial of his *Brady* claim was contrary to, or an unreasonable application of, clearly established federal law.  Gaytan's claim is based on the state's alleged failure to provide trial counsel with background information about Silva and his history as an informant, and Gaytan specifically identifies an "informant source file" that should have been turned over.  (D.E. 1 at 11).  The evidence before the state court in the Article 11.07 proceedings contained contradicting affidavits from Perkins and Mann.  Perkins stated that he received no *Brady* material from the state regarding Silva.  (D.E. 8-52 at 169-70).  Mann refuted this, stating that he met with Perkins before the trial, telling him about Silva's history as an informant for previous district attorneys, and that there was no informant source file for Silva.  (D.E. 8-53 at 37).   In denying Gaytan's *Brady* claim, the state court implicitly made a credibility finding in favor of Mann, which is presumed to be correct.  *Garcia*, 454 F.3d at 444.  The two affidavits, along with a second affidavit from Perkins regarding a discussion he had with a former district attorney who used Silva as an informant, are the only evidence in the record relating

to this issue.  (D.E. 8-52 at 182-83).  Gaytan has not met his burden to show by clear and convincing evidence that the state court's finding was incorrect.  *See id.*  Having failed to meet this burden, Gaytan has not shown that the state court's denial of his claim was contrary to, or an unreasonable application of, federal law.

## IV.   CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A).  Although Gaytan has not yet filed a notice of appeal, the issue of whether he is entitled to a COA will be addressed.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (stating that a district court may *sua sponte* rule on a COA).

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "The COA determination under § 2253(c) requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).  Where a district court rejects the constitutional claims on the merits, the petitioner must show that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  *Slack v. Daniel*, 529 U.S. 473, 484 (2000).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.

Here, because reasonable jurists would not find it debatable that Gaytan failed to state a claim for a violation of a constitutional right, it is recommended that a COA be denied.

## V.     RECOMMENDATION

Based on the foregoing, it is respectfully recommended that Respondent's motion for summary judgment (D.E. 9) be GRANTED and Gaytan's § 2254 petition be DENIED. In addition, it is further recommended that any request for a Certificate of Appealability be DENIED.

Respectfully submitted on December 4, 2020.

_____
Julie K. Hampton
United States Magistrate Judge

41

## NOTICE TO PARTIES

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel.  Within FOURTEEN (14) DAYS after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), General Order No. 2002-13, United States District Court for the Southern District of Texas.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within FOURTEEN (14) DAYS after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).